**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ORANGE PEACH LINE, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:14-cv-1608** |
| | ) | **Judge Aleta A. Trauger** |
| **v.** | ) | |
| | ) | |
| **COUNTRY EXPLOSION, LLC a/k/a GHOST** | ) | |
| **RIDERS OF THE PURPLE SAGE, LLC and** | ) | |
| **DARREN BRADY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

Defendants Country Explosion, LLC and Darren Brady have filed a Rule 12(b)(7)

Motion to Join Jason Stark and Stark Entertainment Group, LLC as Indispensable Parties

(Docket No. 22), to which the plaintiff has filed a Response in opposition (Docket No. 28).

Defendant Brady has also filed a separate Rule 12(b)(2) Motion to Dismiss for Lack of Personal

Jurisdiction (Docket No. 24), to which the plaintiff has filed a Response in opposition (Docket

No. 29).  For the reasons stated herein, both motions will be denied.

**BACKGROUND[1]**

**I.      The Parties and the 2014 Country Explosion Music Festival**

Tyler Hubbard and Brian Kelley are the members of Florida Georgia Line ("FGL"), a

popular country recording act.  Orange Peach Line ("OPL") is the business entity through which

FGL conducts its touring activity.  OPL is a Tennessee corporation with its principal place of

---

[1] Unless otherwise noted, the facts are drawn from the allegations in the First Amended
Complaint ("FAC") (Docket No. 19), including the attached exhibits.  Fed. R. Civ. P. 10 ("A
copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all
purposes.").

business in Nashville, Tennessee.  For ease of reference, the court will generally refer to OPL as "FGL."

According to the FAC, defendant Country Explosion, LLC ("Country Explosion") is a single-member limited liability company organized under the laws of the State of Utah, with its principle place of business in Duchesne, Utah.  FGL also alleges that Darren Brady is the sole owner of Country Explosion.  The FAC alleges that Country Explosion is also known as "Ghost Riders of the Purple Sage, LLC" ("Ghost Riders").[2]  For the last four years, Country Explosion has organized a music festival in Utah, which in 2014 was billed as the "2014 Country Explosion Music Festival" (the "Festival").  To assist in organizing and running the Festival, Brady and Country Explosion entered into an agreement with Stark Entertainment Group, f/k/a Stark Marketing Entertainment, LLC ("Stark Entertainment"), which is operated by an individual named Jason Stark.  Brady and Country Music Explosion authorized Stark Entertainment to engage in several transactions on behalf of Country Explosion, including, *inter alia*, booking performances for the Festival.  The Festival took place July 17-20, 2014.

## II.     The Contract Negotiations and the Contract for FGL to Perform

_____

[2] The record is muddled as to the precise relationship between Country Explosion and Ghost Riders.  FGL addressed a July 20, 2014 letter to Darren Brady with respect to "Ghost Riders of the Purple Sage, LLC and *its affiliate*, Country Explosion LLC, both collectively d/b/a Country Explosion Music Festival."  (FAC, Ex. A (emphasis added).)  Brady countersigned the document as "authorized signatory for GHOST RIDERS OF THE PURPLE SAGE, LLC and COUNTRY EXPLOSION, LLC."   These references suggested that the companies are affiliated but distinct.  By contrast, on the Utah Divisions of Corporations and Commercial Code website, which provides publicly available records concerning Utah corporate entities, the entry for Country Explosion, LLC indicates that the company had a "former business name" of "Ghost Riders of the Purple Sage LLC," which is consistent with the FAC allegations.  *See* https://secure.utah.gov/bes/action/details?entity=8059975-0160 (viewed January 12, 2015).  At any rate, drawing reasonable inferences in favor of FGL, the FAC and its attachments indicate that Ghost Riders and Country Explosion are at least related entities, if not the same entity.  For purposes of the motion, the court will assume that the companies are synonymous.

In 2013, well in advance of the Festival, Brady and Country Explosion developed a strategy to increase the size and scope of the upcoming 2014 Festival. Brady and his representatives reached out to contacts in Nashville in an effort to procure popular country acts for the Festival, and Brady also hired a prominent Nashville-based producer to serve as a consultant.[3] In October 2013, Brady and his representatives traveled to Nashville for the International Entertainment Buyers Association ("IEBA") conference, where Brady met with representatives from many Nashville booking agencies, including some agencies with whom Brady had past dealings. Among these booking agencies, Brady met with Buddy Lee Attractions ("BLA"), which was the booking agent for FGL at the time. During his meeting with BLA, Brady personally negotiated the outline of an agreement to have FGL perform at the Festival.

Less than three weeks later, the agreement that Brady had outlined with BLA was memorialized. On November 5, 2013, FGL (through its agent BLA) and Country Explosion (through its agent Stark Entertainment) contracted for FGL to perform at the 2014 Festival. (FAC, Ex. A, at Page ID #:11-12.) The agreement lists FGL as the "Artist" and "Jason Stark/Ghost Riders of the Purple Sage, LLC C/O Stark Ent" as the "Purchaser." In substance, the contract binds FGL to perform at the Festival on July 20, 2014 (the last day of the Festival) in return for $450,000, half payable immediately and the remaining $225,000 to be paid to FGL on the day of the show (*i.e.*, on July 20, 2014). At the bottom of the contract are two signature blocks: (1) a block identifying the "Purchaser" as "Ghost Riders of the Purple Sage, LLC C/O Stark Ent," below which is the typed signature of "Jason Stark" in the signature line; and (2) a block identifying the "Artist" as "Florida Georgia Line," which contains an unsigned line for an

---

[3] Although not specifically identified by name in the text of the FAC, documents attached to the FAC indicate that the producer was an individual named Jeff Davis at "SUM Management." (*See* FAC Ex. A, Page ID#:27 (identifying "Producer" as "Jeff Davis – SUM Management"; and Page ID:#11 (identifying "Production" contact as "Jeff Davis").)

individual named Anthony Wozniak (who presumably worked for BLA).  The contract notes that

FGL would provide a "rider" to the contract at a "later date."

On November 25, 2013, ostensibly on behalf of Country Explosion, Jason Stark executed

two riders to the November 3, 2013 agreement.  FGL had presented one of the riders, which is

identified as the "Florida Georgia Line: 2013 Contract Rider" (the "FGL Rider").  (*See* FAC, Ex.

A, Page ID#: 13-26.)  The FGL Rider states that it is "attached to and made part of the Contract

('Contract') between FLORIDA GEORGIA LINE ('Artist' or 'Producer') and the purchase of

said services ('Purchaser') as defined on the face of the Contract . . . ."  It states that "the

purchaser's initials at the bottom of each page indicate understanding and compliance with the

stated requirements."  Each page of the rider bears the stamped initials "JS."

The FGL Rider contains numerous terms, including, among others:

- A "payment" term stating that FGL "will be paid in [] certified or cashier's check made payable to Orange Peach Line, LLC, on demand, prior to performance on day of show."  (*Id.* ¶ 1.)

- Numerous handwritten references to the Festival itself, including references to the "flat fee" payable "to artist per contract face."  (*See id.* at pp. 1, 2, 4, and 5.)

- Highly specific requirements related to the Festival, including requirements relating to power, sound, lighting, staging, food in the dressing room and buses, and the like.  (*See, e.g., id.* ¶¶12, 15, and 16-19.)

- The following forum selection clause: "All parties to this agreement acknowledge that this Agreement was entered into the State of Tennessee [sic] and shall be governed by the law of the State of Tennessee.  Further, all parties acknowledge that Nashville (Davidson County) Tennessee is the appropriate forum for any and all litigation arising out of or involving this agreement and/or the performances of any duties hereunder.  The parties therefore consent to the exclusive jurisdiction and venue in Davidson County, Tennessee.  Any litigation filed outside Davidson County, Tennessee, will be subject to immediate dismissal along with the appropriate sanctions under FRCP 11 or the corresponding state court rules.  The parties further agree that the prevailing party in any litigation

will be entitled to recover their [sic] costs including reasonable attorney fees and court costs." (*Id.* ¶ 33(b).)

- A provision stating that "the contract may not be changed, modified, or altered, except by an instrument in writing, signed by the parties, in accordance with Tennessee law."

- A provision stating that "THIS ENGAGEMENT IS NOT FIRM AND NO ADVERTISING CAN BE DONE UNTIL THE CONTRACT AND RIDER BOTH ARE FULLY SIGNED AND EXECUTED BY ALL PARTIES."

At the conclusion of the rider, under a signature block bearing the heading "AGREED AND ACCEPTED" and above the word "BUYER," is the typed signature of "Jason Stark," dated November 25, 2013. The signature block for the "Artist" is blank.

Country Explosion has filed the other rider, which is entitled "Country Explosion Music Festival 2014: Contract Rider" ("Country Explosion Rider"). (FAC, Ex. A, Page ID:# 27-31.) Each page of the Country Explosion Rider bears two logos: one for "Country Explosion: Utah's Largest Music Festival" and another for "Stark Entertainment Group." The rider identifies "Jason Stark – Stark Entertainment Group" as the Festival's "Promoter" and "Jeff Davis – SUM Management" as the Festival's "Producer." The first page of the rider states as follows:

> This Rider is an amendment to *the contract between Ghost Riders of the Purple Sage, LLC – DBA Country Explosion Music Festival* . . . and Florida Georgia Line . . . date of performance Sunday July 20, 2014 . . . . Notwithstanding any language to the contrary contained in the above-referenced contract, the following terms and conditions shall be incorporated therein by this specific reference and shall amend the terms and conditions thereof.

*Id.* (emphasis added). In the rider, "Artist and Buddy Lee Attractions acknowledges [sic] receipt of a 50% deposit of $225,000 received November 25, 2013." (*Id.* ¶ 1.) Among other provisions, the rider specifies certain Festival-related expenses to be borne by FGL (¶ 4), binds FGL not to perform at two specific (presumably competing) events within 180 days of the Festival (¶ 3), and obligates FGL to participate in a "meet and greet" during the Festival (¶ 7). The rider states that

5

"[t]he above rider and modifications to the subject contract are acceptable and this rider is hereby incorporated into the entire agreement." (*Id.* at Page ID#: 31.) The rider has two signature blocks. One bears the typed signature of "Jason Stark," dated November 25, 2013, under which Stark is identified as "Festival Director, Country Explosion, Stark Entertainment Group." (*Id.*) The signature block for "Artist" is unsigned.

For ease of reference, the court will refer to the November 5, 2013 contract and the two associated riders collectively as the "Contract."[4] According to the FAC, Stark signed the Contract with Brady and Country Explosion's full authorization and knowledge.

As the court discusses further herein, the defendants have taken some questionable legal and factual positions with respect to actual signatories to the contract and its enforceability. For example, Country Explosion appears to argue the following positions: (a) it is not synonymous with Ghost Riders; (b) it has, and had, no affiliation with Ghost Riders; (c) Stark Entertainment, not Ghost Riders (or Country Explosion), was the only signatory to the contract; (d) Stark had no authority to act as an agent for Ghost Riders or Country Explosion in executing the Contract; or (e) Stark did not actually sign the Contract because the signature is typewritten. By contrast, FGL alleges that Ghost Riders and Country Explosion are synonymous, that Stark/Stark Entertainment had authority to sign the contract on behalf of Country Explosion, and that Stark actually executed the different components of the Contract for Country Explosion. In the context of the instant motions, the court must accept FGL's allegations as true and draw all reasonable inferences in favor of FGL. Regardless, the defendants have not presented competent evidence to rebut FGL's FAC allegations.

---

[4] In the FAC, for reasons that are not clear, OPL defines the "Contract" as including only the FGL Rider but not the Country Explosion Rider. In this opinion, the court will assume, without deciding, that both riders were incorporated into the November 3, 2013 agreement, notwithstanding the fact that FGL did not countersign the second rider.

### III.    Failure to Pay FGL Under the Contract

FGL arrived at the Festival on July 20, 2014, ready to perform.  Before the performance, FGL and its representatives were told by other Festival artists that the Festival organizers were experiencing financial difficulties that would preclude Country Explosion from paying FGL with a certified or cashier's check, as required by the Contract.  When asked about the rumor, Brady admitted that Country Explosion was unable to pay FGL in the manner required by the Contract.  FGL's representatives confronted Brady and his representatives, requesting a specific acknowledgement of Country Explosion's contractual obligations and assurances of the method by which the payment obligation would be fulfilled.  Brady assured FGL that he and Country Explosion would be able to pay the balance owed under the Contract.  Brady also represented that he would personally guarantee the payment from funds he received from the Festival.

In reliance on Brady's representations, FGL executed an acknowledgement letter, dated July 20, 2014, in which it modified the payment terms of the Contract.  (FAC, Ex. A.)  The letter bears the heading "ORANGE PEACH LINE f/s/o Tyler Hubbard and Brian Kelley, collectively p/k/a FLORIDA GEORGIA LINE," and is addressed as follows:

> Mr. Darren Brady
> Ghost Riders of the Purple Sage, LLC and
> its affiliate, Country Explosion LLC,
> both collectively d/b/a Country Explosion Music Festival ("Purchaser")
> Duchesne, UT 84021

In full, the letter states as follows:

> With respect to our performance tonight, you have informed us that you are unable to make payment to us for the balance of the agreed price in the manner provided in the contract (i.e., certified or cashier's check) between you and us dated November 5, 2013 and amended by written riders dated November 25, 2013 (the "Contract").
>
> In lieu of the payment terms provided in the Contract, you have proposed and agree to make payment today of the remaining $225,000 due directly to our

tour manager, Troy Johnson, as follows: (a) $20,000 cash, and (b) a check from Country Explosion, LLC payable to Orange Peach, Inc. in the amount of $205,000 ("Company Check").

Nothing in this letter shall be construed as a waiver of any and all of our rights and remedies in equity and in law, pursuant to the Contract or otherwise, all of which are hereby expressly reserved. Please sign this letter where required below to indicate your acceptance and agreement to these terms.

(FAC, Ex. B.) The letter is signed by Hubbard and Kelley for "Orange Peach Line, Inc." On the bottom of the letter, under the heading "ACCEPTED AND AGREED," is a signature block for "Darren Brady, authorized signatory for GHOST RIDERS OF THE PURPLE SAGE, LLC and COUNTRY EXPLOSION, LLC." Brady's signature appears above the block. Also, below the block and Brady's signature, Brady handwrote the following language: "Guarantor for Ghost Riders, LLC & Country Explosion LLC" and "Principle [sic] is Stark Entertainment Group." The court will refer to the July 20, 2014 letter and associated enclosure as the "Modification" to the original Contract.

Consistent with the Modification's terms, Brady and his representatives provided FGL with $20,000 cash and a check for $205,000. Brady and his representatives did not place any conditions on the deposit of the check. FGL performed at the Festival on July 20, 2014, as scheduled.

On July 22, 2014, FGL's representatives attempted to deposit the check. The defendants' bank informed FGL that there were insufficient funds to cover the check. Troy Johnson, FGL's tour manager, contacted the Festival's Nashville-based producer (Jeff Davis) by email to complain that "the check is NO good," and Davis in turn forwarded Johnson's email to Brady. That afternoon, Brady responded as follows, copying Stark (the Festival's promoter) and Johnson (FGL's tour manager), among others:

Just so everybody is clear on this the principle [sic] is Stark Entertainment Group LLC. They are the signer of the contract for Florida Georgia Line to perform at Country Explosion. I Darren Brady signed saying that I would guarantee payment which I fully intend to do. There is multiple credit lines transaction done [sic] over this past weekend that have yet to be deposited in the Country Explosion account they should all hit our account in the next two days in which the check will easily clear. I know this is not your problem but I will guarantee payment.

Thanks,
Darren Brady
Country Explosion

(FAC, Ex. C.)

On July 25, 2014, FGL learned that, notwithstanding Brady's promises, the defendants had ordered a "stop payment" on the check. The defendants refused to pay the balance thereafter.

On July 29, 2014, FGL's counsel sent a demand letter to Brady and Stark. In the letter, FGL's attorney addresses "Ghost Riders of the Purple Sage, LLC d/b/a Country Explosion, LLC, Stark Entertainment Group, LLC and each of you, among others," whom the letter collectively defines as "Ghost Riders". The letter complains that "Ghost Riders" materially breached the Contract by failing to pay the remaining $225,000 to FGL. The letter asserts that, in the July 20, 2014 Modification, "Ghost Riders" reaffirmed its obligations to FGL and provided that both Brady and Stark Entertainment would guarantee Ghost Riders' obligation.[5] The letter demands $205,000 by July 31, 2014 in order to "avoid litigation in Davidson County, Tennessee, as the mandatory forum for disputes arising under the parties' Agreement."

Neither Brady/Country Explosion nor Stark/Stark Entertainment paid FGL the outstanding balance. Instead, on August 1, 2014, Country Explosion filed a lawsuit in the

---

[5] The terms of the letter may have mischaracterized the Modification in one respect. Although Brady arguably guaranteed the underlying amount under the contract by Ghost Riders of the Purple Sage, LLC, the Modification does not appear to contain a similar guarantee by Stark Entertainment.

United States District Court for the District of the Utah against FGL, FGL's tour manager Troy Johnson, and another FGL representative (Seth England), claiming breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, tortious interference with business relations, and defamation. In that lawsuit, Country Explosion demands $15,000,000 in damages and $45,000,000 in punitive damages. On December 1, 2014, Country Explosion unilaterally filed an Amended Complaint in that case. There are no docket entries in the case other than the Complaint and Amended Complaint.[6] Counsel for Country Explosion in that lawsuit, Mr. David Drake, is the same counsel for Brady and Country Explosion here.

## IV.     Procedural History

On August 6, 2014, FGL filed a Complaint in this court against Brady, Country Explosion, and Jason Stark d/b/a Stark Entertainment Group. On September 2, 2014, Brady moved to dismiss the Complaint for lack of personal jurisdiction and for insufficient service of process. (Docket No. 10.) In contrast to Brady individually, Country Explosion filed an Answer to the Complaint. (Docket No. 12.) Brady and Country Explosion are represented by the same Utah lead counsel and by the same local counsel. Country Explosion's Answer contains a detailed preamble in which, in somewhat roving fashion, Country Explosion asserts that (1) no one "connected with the country music festival" signed the Contract and that, in fact, the Contract was "never signed," (2) Country Explosion and FGL entered into a separate oral agreement, whereby FGL agreed to receive a check for $205,000 in return for not depositing the check before July 22, 2014, and that FGL breached the agreement by attempting to deposit the check on July 21, 2014; (3) Brady never personally guaranteed another entity's debt; (4) even if Brady did attempt to guarantee another entity's debt, that guaranty is unenforceable because it

---

[6] Thus, in the Utah case, it does not appear that the named defendants in that case have been served or that Country Explosion has attempted to prosecute its claims.

was not supported by consideration; (5) Brady's July 22, 2014 email, reiterating his intent to guarantee the debt, was only written in response to FGL's "reckless and defamatory email which Mr. Brady attempted to mitigate the toxic effects of by stating he would guaranty payment of the check"; and (6) Country Explosion "cannot now book any Nashville artists for the 2015 country music festival" because of bad publicity stemming from the incident.  Among other affirmative defenses, Country Explosion asserts that (1) "even if Jason Stark had signed the November 25, 2013 contract, he was not authorized by Country [Explosion] to do so," and (2) "FGL has no signed contract" because "[t]he November 25, 2013 contract was signed by no one.  It only bore the typed signature of Jason Stark.  Having never been signed, Country [Explosion] is not bound by the forum selection clause of the November 25, 2013 contract."[7]

On September 19, 2013, as a matter of right, OPL filed a Notice of Voluntary Dismissal of Stark Entertainment (Docket No. 18) and filed an Amended Complaint against only Brady and Country Explosion (Docket No. 19).  In the Amended Complaint, FGL asserts two claims: (1) a claim against both Brady and Country Explosion for breach of contract and associated breach of the covenant of good faith and fair dealing with respect to the Contract and Modification; and (2) a claim against Brady for fraud in the inducement.  With respect to the second claim, FGL alleges that Brady induced FGL to agree to the Modification (which modified the original payment terms set forth in the Contract) by reassuring FGL that Country Explosion would satisfy its payment obligation and that Mr. Brady would be able to guarantee payment from funds received by him from Festival receipts.  FGL contends that Brady knew that neither he nor Country Explosion would actually honor their contractual obligations.

---

[7] These positions appear to be untenable in light of other record evidence before the court, which the court discusses in the final section of this opinion.

In response to the Amended Complaint, Country Explosion and Brady filed a Motion to Join Jason Stark and Stark Entertainment Group, LLC, as Indispensable Parties, under Rules 12(b)(7) and 19(a).  In the body of the motion, Country Explosion and Brady request that the court join Jason Stark and SEG as "necessary parties" under Rule 19(a).[8]  Brady, appearing specially, filed a separate Motion to Dismiss for Lack of Personal Jurisdiction under Rule 12(b)(2).

## ANALYSIS

### V.      Brady's Rule 12(b)(2) Motion

#### A.  Non-Merits Arguments

FGL argues that Brady has waived the right to challenge personal jurisdiction because (1) he failed to join the Rule 12(b)(2) motion to his Rule 12(b)(7) motion and (2) he entered a general appearance with respect to the Rule 12(b)(7) motion, thereby voluntarily waiving any right to challenge this court's exercise of personal jurisdiction over him.

Under the federal rules, a party that files a motion under Rule 12(b)(7) for failure to join a party under Rule 19 waives the right to assert a personal jurisdiction challenge *after* filing that motion.  *See* Fed. R. Civ. P. 12(g) and 12(h)(1).  On the other hand, a party may assert both challenges together in a joint motion (Rule 12(g)(1)), and Rule 12 does not preclude a defendant from filing a challenge premised on Rule 19 at a later stage in the case.  *See* Rule 12(h)(2).  Here, by the letter of the rules, Brady should have joined his Rule 12(b)(2) and Rule 12(b)(7)

---

[8] As explained herein, the defendants are mixing terms.  An "indispensable party" is an entity that (1) should be joined to the lawsuit, (2) cannot be feasibly joined to the lawsuit, and (3) without whom, in the court's judgment, the lawsuit cannot proceed in equity and good conscience.  *See* Fed. R. Civ. P. 19(b); James Wm. Moore, Moore Fed. Practice (3d ed. 2014), § 19.02[2]-[3].  Here, the defendants appear to argue that Stark and Stark Entertainment are "required parties" that *can* be joined to the lawsuit under 19(a).

challenges in the same motion; instead, he filed the Rule 12(b)(7) challenge first (at approximately 4:51 p.m. on October 22, 2014) and his Rule 12(b)(2) challenge second (at approximately 5:12 p.m. on the same day). Although the rules require that Brady should have joined the two motions, the court regards the error as a harmless one: the motions were filed on the same date just twenty minutes apart, in compliance with the intent of Rule 12(g) (if not its letter) to have a plaintiff raise both challenges simultaneously. Brady's minor error has not prejudiced FGL in any way or otherwise delayed the proceedings.

Because the requirement of personal jurisdiction flows from the Due Process Clause and protects an individual liberty interest, an individual may also submit to the jurisdiction of the court by appearance. *Gerber v. Riordan*, 649 F.3d 514, 518 (6th Cir. 2011). In other words, a defendant can waive a potential personal jurisdiction defense either explicitly or implicitly. *Id.* In deciding whether a defendant has implicitly waived a personal jurisdiction defense, the court must determine whether any of the defendant's appearances and filings constituted "legal submission to the jurisdiction of the court." *Id.* at 519. Although the voluntary use of certain district court procedures serve as constructive consent to the personal jurisdiction of the district court, not all do. *Id.* "Only those submissions, appearances and filings that give plaintiff a reasonable expectation that [the defendant] will defend the suit on the merits or must cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking, result in waiver of a personal jurisdiction defense." *Id.* (internal brackets, citation, and quotation omitted). This requires a consideration of all the relevant circumstances. *King v. Taylor*, 694 F.3d 650, 659 (6th Cir. 2012).[9]

---

[9] In *Gerber*, a majority of the panel appeared to hold that entry of a "general appearance" alone constituted waiver of a personal jurisdiction defense. In a concurring opinion, Judge Karen Nelson Moore explained that (1) the majority did not apply the new test that it had articulated and (2) the federal rules had been amended specifically to abrogate the old doctrine of waiver by

Here, Brady challenged personal jurisdiction under Rule 12(b)(2) in response to the original Complaint – a motion that was rendered moot when FGL filed the FAC – and again challenged it under Rule 12(b)(2) in response to the FAC. Brady's counsel also filed an initial general appearance for Country Explosion and a special appearance for Brady. Furthermore, the Rule 12(b)(7) motion by Brady and Country Explosion would stand even without Brady's involvement. Thus, although Brady should not have joined the Rule 12(b)(7) motion by general appearance, the court does not find that his joinder in the Rule 12(b)(7) motion constitutes waiver of the right to challenge personal jurisdiction under the circumstances. The court will therefore analyze the merits of Brady's Rule 12(b)(2) motion.

## B. Personal Jurisdiction Challenge

Brady contends that FGL's FAC does not contain allegations sufficient to support the exercise of personal jurisdiction over him.[10] In the absence of any competent evidentiary submission by Brady and in light of Brady's general reliance on the sufficiency of the FAC and its attachments, the court finds no need to conduct an evidentiary hearing, and no party has

---

entering a "general appearance." *Gerber*, 649 F.3d at 521. Justice Moore's reasoning is sound and, following *Gerber*, both the Sixth Circuit and district courts within this circuit have not construed *Gerber* as requiring a finding of waiver solely based on the entry of a general appearance; instead, courts generally agree that "all the relevant circumstances" must be considered. *See Taylor*, 694 F.3d at 659; *see also Allstate Ins. Co. v. Electrolux Home Prods., Inc.*, 2014 WL 3615382, at *5 n.4 (N.D. Ohio July 18, 2014) (summarizing post-*Gerber* cases).

[10] By affidavit, a defendant can introduce competent evidence in support of a personal jurisdiction challenge for the court's consideration. Here, the only document that Brady introduces in support of his motion is a purported "Strategic Partnership" agreement between Country Explosion and Stark Entertainment, which concerns some type of joint venture relationship concerning the 2014 Festival. The agreement is unsigned, Brady's counsel represents that it never went into effect, and the document is not supported by an affidavit from Brady. Because it is not competent evidence, the court will disregard the document for purposes of its analysis.

requested one. When a district court rules on a jurisdictional motion to dismiss under Rule 12(b)(2) without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff – here, FGL. *Beydoun v. Wataniya Restaurants Holding*, Q.S.C., 768 F.3d 499, 504 (6th Cir. 2014) (citing *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996)). To defeat the Rule 12(b)(2) motion, the nonmoving party "need only make a prima facie showing of jurisdiction." *Beydoun*, 768 F.3d at 504 (citing *CompuServe*, 89 F.3d at 1262). "[A] court disposing of a 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal, . . . because we want to prevent nonresident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts." *CompuServe*, 89 F.3d at 1262 (internal quotation and emphasis omitted). "Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff [] alleges collectively fail to state a prima facie case for jurisdiction." *Id.*

Personal jurisdiction may be either specific or general, depending on the nature of the contacts the defendant has with the forum state. *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002). General jurisdiction exists when a defendant's contacts with a forum are "substantial" and "continuous and systematic." *Youn v. Track, Inc.*, 324 F.3d 409, 417-18 (6th Cir. 2003). On the other hand, specific jurisdiction exists when a state exercises personal jurisdiction over a defendant in a suit arising out of, or related to, the defendant's contacts with the forum. *Id.*; *see also Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005). Here, the issue is whether the facts alleged in the FAC collectively state a prima facie case for specific jurisdiction.

"For specific jurisdiction to exist in a diversity case, two factors must be satisfied: the forum state long-arm statute, and constitutional due process." *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 679 (6th Cir. 2012). Tennessee's long-arm statute, Tenn. Code Ann. § 20-2-214,

has been interpreted to be "coterminous with the limits on personal jurisdiction imposed by the Due Process Clause of the United States Constitution, and thus, the jurisdictional limits of Tennessee law and of federal constitutional due process are identical." *Intera*, 428 F.3d at 616 (internal quotation omitted).[11] Thus, the court need only determine whether the assertion of personal jurisdiction violates constitutional due process. *Aristech Chem. Int'l v. Acrylic Fabricators*, 138 F.3d 624, 627 (6th Cir. 1998). Under the constitutional due process analysis, specific jurisdiction is proper when the following elements are met:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of personal jurisdiction over the defendant reasonable.

*Intera*, 428 F.3d at 615 (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)); *Bridgeport Music, Inc v. Still N the Water Publ'g*, 327 F.3d 472, 477-78 (6th Cir. 2003); *Neal v. Janssen*, 270 F.3d 328, 333 (6th Cir. 2001).

Construed in the light most favorable to FGL, FGL's allegations – which Brady's brief essentially ignores – satisfy the constitutional standard for specific jurisdiction over Brady. In 2013, Brady reached out to contacts in Nashville to attract talented performers for the Festival, Brady employed a prominent Nashville-based producer to serve as a consultant for the Festival, Brady physically traveled to Nashville to meet with booking agents that included FGL's booking agent BLA, and Brady personally negotiated the framework of an agreement for FGL – a Nashville-based performance group that operates through a Tennessee company with a principal

---

[11] Among other grounds for specific jurisdiction, Tennessee's long-arm statute provides that nonresidents are subject to the jurisdiction of Tennessee courts "as to any action or claim of relief arising from . . . [t]he transaction of any business within this state." Tenn. Code Ann. § 20-2-214(a)(1).

place of business in Tennessee – to perform at the Festival.  With Brady's alleged authorization and approval, that agreement was memorialized less than three weeks later by Brady's agent, Stark Entertainment, on behalf of Country Explosion/Ghost Riders, of which Brady is the sole owner or member.  On July 20, 2014, under the terms of a Contract that Brady and Country Explosion authorized, FGL appeared at the Festival to perform.  After Brady himself admitted that Country Explosion could not pay FGL according to the Contract's terms because of insufficient funds, FGL could have refused to perform at the Festival.  Instead, Brady personally negotiated a solution: he reiterated that Country Explosion or Ghost Riders would follow through on the promise to pay FGL under the Contract and personally guaranteed the debt, provided that FGL would agree to receive payment via different means, namely $20,000 cash and a $205,000 check for the balance from Country Explosion.  In reliance upon Brady's representations – made both on his own behalf and on behalf of Country Explosion/Ghost Riders – FGL agreed to the Modification and performed at the Festival.  Brady and Country Explosion both defaulted on their promises.

This cause of action reflects purposeful availment of the privilege of doing business in Tennessee.  Brady sought out business within Tennessee, traveled to the state to procure that business, and personally negotiated the framework for the Contract at issue in this case within Tennessee to secure a performance at the Festival by a Tennessee-based performance group. Under allegedly false pretenses, Brady then renegotiated the terms of that Contract on behalf of himself and his company to ensure that FGL would perform on the last day of the Festival.  The claims for breach of contract and fraudulent inducement both stem from Brady's course of conduct within Tennessee, his communications directed to Tennessee, his solicitation of business (and business partners) within Tennessee, and the predictable consequences of his actions

(personally and on behalf of his company) on FGL in Tennessee.  Finally, his actions and the consequences caused by his actions have a substantial connection to Tennessee.  Under the alleged circumstances, an exercise of personal jurisdiction in this case is therefore reasonable and the allegations are more than sufficient to state a *prima facie* case for jurisdiction.  *See CompuServe*, 89 F.3d at 1262; *Neal*, 270 F.3d 328; *Temco, Inc. v. Gen. Screw Prods., Inc.*, 261 F. Supp. 793 (M.D. Tenn. 1966); *Milan Express, Inc.*, *v. Missie, Inc.*, 575 F. Supp. 931 (W.D. Tenn. 1983).

For these reasons, Brady's Rule 12(b)(2) motion will be denied.[12]

## VI.    The Defendants' Rule 12(b)(7) Motion

The defendants argue that the court should join Jason Stark and Stark Entertainment as "indispensable parties" to the case.  The nature of the defendants' motion requires some clarification, as its reflects the conflation of distinct concepts.

### A.  Proper Parties, Required Parties, and Indispensable Parties

Rule 20 provides for the "permissive joinder of parties."  For example, Rule 20(a)(2) permits – but does not require – plaintiffs to join multiple defendants in a case, where both of the following conditions are met: (A) "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences," and (B) any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2); *see also Lexington Streetboro, LLC v. Geis*, 2008 WL 5723491, at *6 (N.D. Ohio Feb. 22, 2008).  Parties that satisfy those criteria are often

---

[12] FGL also contends that the Modification bound Brady to the forum selection clause in the underlying Contract, even though Brady was not a signatory to that contract.  Because the court finds that an exercise of specific jurisdiction is warranted for the reasons discussed in this section, the court need not determine whether Brady is actually or constructively bound by the Contract's forum selection clause.

referred to as "proper parties." *See, e.g.*, *Nilsen v. Universal Lighting Techs., Inc.*, 2005 WL 1971936, at *7 (M.D. Tenn. Aug. 15, 2005). Because Rule 20 is permissive, it gives a plaintiff the option to join proper parties, but it does not require the plaintiff to do so, and defendants have no right to insist that proper parties be joined. *See Moore's Fed. Practice* § 20.02[2][a][ii]; *McCormick v. Mays*, 124 F.R.D. 164, 167 (S.D. Ohio 1988).

Rule 19 provides for the *compulsory joinder* of parties, even where the plaintiff has declined to join a particular party in the first instance. Essentially, the rule prescribes certain specific circumstances in which the plaintiff's autonomy to dictate party structure is outweighed by the policy need to join an additional defendant or defendants to the lawsuit. *See Republic of Phillipines v. Pimentel*, 553 U.S. 851, 863 (2008) ("[T]he determination who may, or must, be parties to a suit has consequences for the persons and entities affected by the judgment; for the judicial system and its interest in the integrity of its processes and the respect accorded to its decrees; and for society and its concern for the fair and prompt resolution of disputes"); *see also Moore's Fed. Practice* § 19.02[1].

Under the current version of the rules, Rule 19(a) dictates that a "required party" must be joined to the lawsuit if "feasible." A "required party" is an entity that meets one of two criteria: (1) in that person's absence, the court cannot accord complete relief among existing parties (Rule 19(a)(1)(A)); or (2) the third party "claims an interest relating to the subject matter of the action and is so situated that disposing of the action in that person's absence" might, as a practical matter, impair or impede that person's ability to protect that interest or leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of that interest (Rule 19(a)(1)(B)). Fed. R. Civ. P. 19(a); *Laethem Equip. Co. v. Deere & Co.*, 485 F. App'x 39, 44 (6th Cir. 2012); *see also Moore's Fed. Practice* § 19.02[3][a]. If the

person is a "required party" under either of these criteria, the court must then determine whether joinder is "feasible", *i.e.*, whether joining that person would deprive the court of subject matter jurisdiction or whether service of process is possible. *See Moore's Fed. Practice* § 19.02[3][b].

If joinder of a required party is feasible, the court must order joinder of that party. Fed. R. Civ. P. 19(a)(2). On the other hand, if joinder of a "required party" is *not* feasible, the court must conduct a third and final inquiry under Rule 19(b) to determine whether the case can proceed without that party. *See Pimentel*, 553 U.S. at 863-64. Under Rule 19(b), based on case-specific considerations including a non-exclusive list of factors set forth in Rule 19(b)(1)-(4), the court must "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b); *Pimentel*, 553 U.S. 864. If the court, after conducting the requisite equitable analysis, finds that the case cannot proceed in the absence of the required party, the court must dismiss the case. *See Pimentel*, 553 U.S. at 873. This is a drastic action that courts are generally reluctant to undertake, unless serious harm will result from nonjoinder and the plaintiff's interest can be protected by proceeding in another forum. *See Moore's Fed. Practice* § 19.02[3][c]. Although the rules do not use the term, the Sixth Circuit and other courts appropriately characterize an "indispensable party" as follows: "[a] person or entity 'is only indispensable, within the meaning of Rule 19, if (1) it is necessary [*i.e.*, required], (2) its joinder is cannot be effected, and (3) the court determines that it will dismiss the pending case rather than proceed in the case without the absentee." *Laethem*, 485 F. App'x at 44 (quoting *Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 665-66 (6th Cir. 2004)). As the Supreme Court has pointed out, the rules thus contain the "verbal anomaly" that so-called

"[r]equired persons may turn out not to be required for the action to proceed after all."  *Pimentel*,

553 U.S. at 863.[13]

One final point about Rule 19: compulsory joinder under Rule 19 is distinct from Rules

13, 14, and 20, which, in combination, permit a defending party to engage in third-party practice

---
[13]

The Moore treatise summarizes how the rules were amended in an effort to alleviate
confusion and how some confusion remains, even after the amendments:

> [T]oo many people fail to understand that 'indispensable' is a label placed on the
> absentee *after* completing an analytical process and concluding that the pending
> action must be dismissed.  Indispensability becomes relevant only after the court
> identifies a necessary party *whose joinder cannot be effected*.  In that instance, the
> court has only two choices: (1) it may have the pending case proceed without
> joinder of the necessary party or (2) it may dismiss the pending case.  There is no
> other option.  The decision of whether to proceed or dismiss is guided by a series
> of pragmatic factors which force the court to weigh, among other things, the
> potential harm inflicted by dismissal against the potential harm inflicted by
> proceeding.

> If the court determines that it will dismiss, rather than proceed with the pending
> action, it then—after the fact—labels the absentee "indispensable."  In other
> words, an indispensable absentee is a necessary party whose joinder cannot be
> effected and in whose absence the court chooses to dismiss rather than proceed.
> Unfortunately, many counsel and even some courts fail to understand the process
> by which the court is to determine indispensability, and thus endanger its
> pragmatic efficacy.  In 2007, as part of its restyling of Rule 19, the drafters
> entirely eliminated the word "indispensable" from the Rule.  Noting that the word
> "indispensable" was proper only to confirm that a decision had been reached that
> the case needed to be dismissed due to the inability to join the absent party, the
> term "indispensable" was eliminated from restyled Rule 19 as "redundant."  Time
> will tell whether elimination of the traditional term from the text of Rule 19 will
> encourage proper interpretation of indispensability under the Rule, or whether the
> traditional term will continue to be used (and misused) by courts and counsel.

*Moore Fed. Practice*, § 19.02[2][d].

by serving a nonparty "who is or may be liable to it for all or part of the claim against it."  Fed. R. Civ. 14(a)(1).

**B.  Application**

Here, the sole issue is whether complete relief can be accorded among FGL and the defendants without compulsory joinder of the Stark Entities.  The defendants do not argue that joinder of the Stark Entities is "not feasible," nor do they argue that the case must be dismissed in the absence of the Stark Entities under the Rule 19(b) factors.  Their motion to "join" an "indispensable party" is therefore internally inconsistent: if the Stark Entities can and should be joined under Rule 19(a), then the court cannot conclude that they are "indispensable."  In essence, the defendants are seeking to join a party, not to have the case dismissed.

At any rate, in assessing whether compulsory joinder is justified under Rule 19(a) (or whether dismissal is warranted where compulsory joinder is necessary but cannot be accomplished), courts apply a "pragmatic approach" by considering whether, in light of all the circumstances, "meaningful relief can [] be accorded between the parties without the requested joinder."  *Smith v. United Brotherhood of Carpenters & Joinders of Am.*, 685 F.2d 164, 166 (6th Cir. 1982).  As the moving party, the burden is on the defendants to show that the Stark Entities are needed for just adjudication.  *Alexander v. Chapnick*, 2006 WL 448698, at * (W.D. Tenn. Feb. 18, 2006).

In support of its opposition to the defendants' Rule 12(b)(7) motion, FGL has introduced records relating to the agency relationship between Country Explosion and Stark Entertainment, to which the defendants have made no response, let alone raised a challenge to the documents' accuracy and authenticity.  The documents include a November 12, 2012 Country Explosion & Stark Marketing Entertainment, LLC Strategic Partnership Agreement, in which Country

Explosion contracted for Stark Entertainment to become Country Explosion's "booking and advertising agency of record." (Docket No. 28, Ex. A at pp. 1-3.) This document bears the signatures, each dated November 12, 2012, of Jason Stark for Stark Entertainment and Darren Brady for Country Explosion. FGL has also filed a copy of a check from Brady, dated November 12, 2012, representing the down payment for Stark Entertainment's marketing services under the executed Strategic Partnership Agreement. (*Id.* at p. 6.) On behalf of Country Explosion, Brady also executed an "amendment" on January 1, 2013, which again reiterates that Stark Entertainment would act as Country Explosion's agent with respect to the Festival, including booking "all acts both national and local." (*Id.* at pp. 4-5.) Brady and Stark both executed this agreement on January 10, 2013. Finally, FGL has also filed a copy of a May 22, 2014 "Letter of Intent" signed by Brady, in which Brady, "owner of Country Explosion," indicates his intent to submit to Stark Entertainment a "superseding" contract for the management of all remaining tasks associated with the Festival. (*Id.* at p.7.) Among other representations, Brady promises to pay Stark Entertainment the balance of the "booking fee owed to Stark . . . as soon as Country has satisfied all investors and other debts owed for the 2014 festival and has the funds to do so considering future festival productions." (*Id.*)

Remarkably, the defendants have not responded to the introduction of these records, which belie their previous representations to the court. Indeed, the documents, signed by Brady himself, establish a contractual agency relationship and essentially acknowledge that Country Explosion owes debts incurred relative to the Festival. Thus, the allegations and the uncontroverted supporting evidence offered by FGL show that, with Brady's explicit written authorization, Stark Entertainment acted as Country Explosion's agent in signing the Contract. In general, in a lawsuit against a principal, the agent is not considered to be a required party for

Rule 19 purposes.  *See Soberay Mach. & Equip. Co. v. MRF Ltd., Inc.*, 181 F.3d 759 (6th Cir. 1999); *Nottingham v. Gen. Am. Commcn's Corp.*, 811 F.2d 873, 880 (5th Cir. 1987); *Milligan v. Anderson*, 522 F.2d 1202 (10th Cir. 1975); *N. Am. Specialty Ins. Co. v. Pucek*, 2009 WL 3190391, at *3 (E.D. Ky. Sept. 30, 2009); *Am. Home Mortgage Corp. v. First Am. Title Ins. Co.*, 2007 WL 3349320, at *4 (D.N.J. Nov. 9, 2007); *Wylain, Inc. v. Kidde Consumer Durables Corp.*, 74 F.R.D. 434, 436-37 (D. Del. 1977).  If the Stark Entities acted as Country Explosion's agent in executing the Contract – as appears to have been the case – then FGL can obtain complete relief from Country Explosion with respect to breach of the Contract.  Stark and Stark Entertainment therefore are not required parties with respect to the claim for breach of contract and the covenant of good faith and fair dealing.  Of course, if Stark Entertainment in fact signed as co-principal (rather than as an agent, as FGL maintains), the defendants may be entitled to seek contribution from Stark or Stark Entertainment, if warranted.  But the fact that Stark Entertainment could also be liable to FGL to the same extent as the defendants (or at least Country Explosion) does not mean that the court must compel the Stark Entities to appear as defendants.[14]

Moreover, even if the defendants were correct that Stark Entertainment did not have their authority to act as an agent for Country Explosion, then the defendants could prove that they are not liable for breaching the Contract and they will receive complete relief relative to FGL  -- *i.e.*, that they owe FGL nothing on FGL's claim for breach of the Contract.

---

[14] As FGL notes in its brief, to the extent the defendants may have valid cross-claims against Stark and Stark Entertainment, the defendants could seek leave to join the Stark Entities under Rules 13, 14, and 20, which provide for permissive joinder of additional parties against whom cross-claims may be asserted under appropriate circumstances.  Again, although the rules may *permit* the defendants to obtain leave to join the Stark Entities as third-party defendants upon an appropriate showing, the defendants have not shown that joinder of the Stark Entities is *compelled* in this case.

As to the fraudulent inducement claim against Brady, it is undisputed that Stark and Stark Entertainment played no role in the Modification or the other facts related to that claim. The claim is based on representations that Brady made to FGL in an effort to induce FGL to agree to the Modification on the night of FGL's performance at the Festival. Thus, the Stark Entities are not required parties to the fraudulent inducement claim.

Because the Stark Entities are not required parties as to either claim, the motion for compulsory joinder under Rule 19(a) will be denied.

## CONCLUSION

For the reasons stated herein, Brady's Rule 12(b)(2) motion and the defendants' Rule 12(b)(7) motion will be denied. The defendants shall respond to the FAC in compliance with the applicable rules, and the court will reset the initial Case Management Conference by separate order.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge